[Crim. No. 1793.    Third Dist.    Apr. 30, 1942.]

THE PEOPLE, Respondent, v. HENRY EDGAR RAY-
MOND SMITH, Appellant.

George E. Foote and R. E. Vaughn for Appellant.

Earl Warren, Attorney General, and J. Q. Brown, Deputy
Attorney General, for Respondent.

TUTTLE, J.—Appellant was charged with the crime of
murder, and thereafter was found guilty, by a jury, of man-
slaughter. He now appeals from the judgment of conviction
and order denying a new trial.

Appellant seeks to reverse the judgment upon two grounds, to wit: 1st: The insufficiency of the evidence to sustain the conviction; and 2d: Misconduct of the district attorney in his closing argument which resulted in a miscarriage of justice by affecting the substantial rights of the defendant.

Taking up the first ground, we deem it necessary to give a brief summary of the facts proven before the jury. During the times herein mentioned, appellant lived with his elderly father in a small apartment in the city of Sacramento. The victim of the killing was one Albert Burke, who had lived with his wife Leona, for some eight years, but who was not married to her until about one year prior to the shooting. Leona had been married three times, and had two children by decedent, and one by each of her other two husbands. The Burkes and the Smiths had been friendly for a number of years, living in adjoining dwellings. On the night of October 25, 1941, or very early Sunday morning, decedent went to the Smith apartment and pounded loudly upon the door. Appellant opened the door, and according to his testimony, decedent struck him with his fist, knocking him back into the room. Appellant thereupon reached for a revolver which was concealed under some quilts. He shot the decedent several times, inflicting a wound which was fatal. The visit of decedent to the apartment of Smiths appears from the evidence to have been the result of a conspiracy between Leona and appellant. According to the statement made by the latter, and which appears in the record, on the night of the killing, appellant and Leona had a long talk concerning her husband. Leona knew that appellant had a gun on the premises. She therefore proceeded to impregnate his mind with the idea that it would be very good strategy for the two of them to get rid of the husband in some manner. We quote from the statement:

"Question: All right. A. And I took the two drinks of whiskey, and she says, 'Al hit me on the jaw.' Well, it was swollen a little. I says, 'The dirty cur,' like that. I says, 'A man who will hit a woman won't fight a man, and,' I says, 'he ain't much to do it.' *And she says, 'I wish some kind of an accident would happen to him, either like he would get killed, or something like that.'* 'Well,' I says, 'you don't want to think nothing like that because,' I says, 'we have been good friends all the way around and'—Question: Go ahead. A. And

she says, 'well,' she says, 'he is nothing in the world but what you would call a brute, more than anything.' And she says, 'I just can't stand him much longer.' 'Well,' I says, 'that ain't none of my business.' And she says, 'Where do you keep your gun?' I says, 'I keep it on the dresser most of the time.' 'Well,' she says, 'why do you keep it on the dresser?' 'Well,' I says, 'so it won't be concealed; if anybody comes down there they can see it.' And she says, 'Why don't you keep it over there next to the suitcases where the quilts are?' She says, 'You can keep it underneath there.' And—'Well,' she says, 'that might be a pretty good idea;' like that. *And she says, 'I am going to phone up Al,' and says, 'and have an understanding with him and bring him down to the house.' She says, 'but,' she says, 'he might come down mad and start a fight with you.' 'But,' she says, 'if you shoot a man in your house,' she says, 'it is—you can call for justifiable, or something like that.'* Well, you know what I mean; self-defense. *'And,'—'and it happened in your house.' And—'well,' I says, 'I tell you,' I says, 'I don't know; I don't know much about the law.'* Just like that. And—well, she says, 'I am going to phone him up and bring him down after I have a talk with him, and,' *she says, 'if anything happens,' she says, 'you can have my daughter and I will take your father.'* Like that. 'Well,' I says, 'I don't want your daughter, and,' I says, 'if Dad ever took you,' I says, 'I would want to get away, because,' I says, 'I don't want neither one of you'."

The father of appellant testified that the revolver with which the shooting was done was loaded with shells sometime Saturday night. It also appears that the revolver had been taken from its usual location on the dresser and placed beneath the quilts above mentioned. It further appears that after Leona had told her husband that the Smiths had rented an apartment for her, the husband immediately became very angry and started for the Smith apartment. The wife testified that she followed him to the apartment, and she admitted that at no time did she warn him of the fact that appellant possessed a revolver. She was immediately behind her husband, and saw him knock at the door of the apartment; she heard the door open, and saw a burst of flame as the revolver was fired. The husband, after the shooting, fell immediately to the floor, and was conscious for a very short period. She testified that her husband said, before he lapsed into unconsciousness, "You

got me, Edgar,'' (meaning the appellant). Edgar said, ''That is what you get for fooling around.'' The evidence further showed that decedent was unarmed. In all, three shots were fired.

We think the evidence is sufficient to support the verdict. Both the appellant and the wife of decedent are fortunate that they were not found guilty of a more serious offense. The woman took the role of a modern ''Lady Macbeth,'' and planted in the mind of appellant, who was far younger than she, the idea that it would be best for both of them if the decedent was done away with. For this, we have the testimony of appellant himself. It is regrettable that the State did not see fit to bring the wife before the bar of justice. There is ample evidence from which the jury could have found premeditation, instead of finding that the killing was done in the heat of passion.

We find no merit in the contention that there was any prejudicial misconduct on the part of the district attorney in his argument to the jury. In this connection it is urged that the district attorney stated to the jury that the deceased worked every day, whereas in truth and in fact, he did not have a steady job; that the district attorney stated that appellant furnished the wife with liquor and constantly plied her with it; that the district attorney referred to the law of some other states concerning the necessity for one in a quarrel to warn the other before he starts shooting; and finally, that the district attorney made some reference to the future economic condition of the two children of decedent. We cannot say that the district attorney went beyond the bounds of legitimate argument. Furthermore, the trial court admonished the jury to pay no attention to the foregoing statements. The evidence of guilt is so plain that we do not see how the jury could possibly have been influenced by the incidents mentioned. In 8 Cal. Jur. 621, 622, § 602, it is stated:

''A judgment will not be reversed because of the misconduct of the district attorney except in clear and extreme cases, and unless the misconduct is flagrant and obviously prejudicial, and unless, in the opinion of the appellate court from a review of the entire record, it results in a miscarriage of justice.'' Certainly, there has been no miscarriage of justice here.

The judgment and order denying motion for a new trial are, and each of them is, hereby affirmed.

Thompson, Acting P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 28, 1942.